SC:DCW/CCC:BDM/KKO
F.#2012R00953

**CR 13   4 5*3**

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUL 31 2013 ★

LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

BRIAN R. CALLAHAN and
ADAM J. MANSON,

            Defendants.

- - - - - - - - - - - - - - - X

I N D I C T M E N T

HURLEY, J.

Cr. No. _____
(T. 15, U.S.C., §§ 78j(b)
and 78ff; T. 18, U.S.C.,
§§ 371, 981(a)(1)(C),
1028A(a)(1), 1028A(b),
1028A(c)(7), 1343, 1349, 2
and 3551 et seq.; T. 21,
U.S.C., § 853(p); T. 28,
U.S.C., § 2461(c))

TOMLINSON, M

THE GRAND JURY CHARGES:

INTRODUCTION

At all times relevant to this Indictment, unless
otherwise indicated:

The Defendant Brian R. Callahan and His Funds

1.    The defendant BRIAN R. CALLAHAN resided and
maintained a business office in Old Westbury, New York.  Prior to
June 2009, CALLAHAN held various licenses issued by the Financial
Industry Regulatory Authority ("FINRA") and its predecessor and
was a registered representative at several investment advisor
firms.  In June 2009, CALLAHAN consented to a FINRA order barring
him from associating with any FINRA member.

2.    Between June 2005 and February 2012, the defendant
BRIAN R. CALLAHAN managed offshore investment funds, which
included: Pangea Offshore High Yield Portfolio, LLC ("Pangea

Offshore"); Pangea Global Opportunities Portfolio, LLC ("Pangea

Global"); Diversified Global Investments (BVI), LP

("Diversified"); Horizon Millennium Investments, LP ("Horizon

Millennium"); The Masters Global Fund, LP ("Masters Global"); and

Fiduciary Select Income Fund, LP ("Fiduciary") (collectively,

"Callahan's investment funds"). Diversified, Horizon Millennium,

Masters Global and Fiduciary (collectively, the "Audited Callahan

Funds") were audited by an independent outside auditor (the

"Independent Auditor"), whose identity is known to the Grand

Jury. CALLAHAN operated and managed the Audited Callahan Funds

through investment advisor and general partner entities that he

controlled. Two of Callahan's investment funds, Pangea Offshore

and Pangea Global (collectively, the "Pangea Funds"), were

unaudited. CALLAHAN operated and managed the Pangea Funds

directly. Callahan made all investment decisions on behalf of

the Callahan investment funds and received management fees based

on the funds' respective assets.

   3. The defendant BRIAN R. CALLAHAN organized Pangea

Offshore as a Nevis, West Indies limited liability company in or

around June 2005. Pangea Offshore owned 100% of Pangea Global,

which CALLAHAN also organized as a Nevis limited liability

company.

   4. The defendant BRIAN R. CALLAHAN organized

Diversified as a British Virgin Islands ("BVI") limited

2

partnership in or around November 2006. CALLAHAN told investors in Diversified that he would invest their money in a New York-based hedge fund ("Hedge Fund One").

5. The defendant BRIAN R. CALLAHAN organized Horizon Millennium as a BVI limited partnership in or around April 2007. CALLAHAN told investors in Horizon Millennium that he would pool their money and invest it in another New York-based hedge fund ("Hedge Fund Two"), which CALLAHAN claimed had a minimum investment requirement of $5 million.

6. The defendant BRIAN R. CALLAHAN organized Masters Global as a BVI limited partnership in or around September 2007. CALLAHAN told investors in Masters Global that he would invest their money in a portfolio of ten hedge funds offered by a New York-based brokerage firm ("Hedge Fund Three").

7. The defendant BRIAN R. CALLAHAN organized Fiduciary as a BVI limited partnership in or around February 2009. CALLAHAN represented to investors in Fiduciary that he would invest their money in high dividend stocks and bonds, certificates of deposit ("CDs"), and diverse government and corporate fixed income instruments. CALLAHAN claimed that an investment in Fiduciary was a short-term, liquid investment similar to an investment in a money market fund.

3

The Defendant Adam J. Manson and His Entities

       8.    The defendant ADAM J. MANSON resided in New York, New York, and maintained business offices in Great Neck and Montauk, New York. MANSON was the defendant BRIAN R. CALLAHAN's brother-in-law. MANSON formed and managed two real estate corporations, Distinctive Investments LLC ("Distinctive Investments") and Distinctive Ventures LLC ("Distinctive Ventures") (collectively, "Distinctive").

       9.    In or around December 2006, the defendant ADAM J. MANSON assigned 100% of the equity membership in Distinctive Ventures to Distinctive Investments. Distinctive Ventures was the only asset of Distinctive Investments. MANSON and the defendant BRIAN R. CALLAHAN were the owners and managers of Distinctive Investments. MANSON and CALLAHAN also both controlled Distinctive Ventures.

The Panoramic View

      10.    In or around October 2006, the defendants BRIAN R. CALLAHAN and ADAM J. MANSON agreed to acquire the Panoramic View, a cooperative development in Montauk, New York, by purchasing the shares of a New York cooperative corporation that owned the Panoramic View, 93 Old Montauk Owners, Inc. (the "Cooperative Corporation"). The Panoramic View consisted of five multiple unit buildings and three beach-front cottages situated on approximately 10 acres of real property. In all, the Panoramic

4

View contained approximately 117 cooperative units and was the only asset of the Cooperative Corporation. As with other cooperative developments, it was anticipated that if CALLAHAN and MANSON sold a unit of the Panoramic View, the homeowner would not own the underlying unit in the development but, instead, would own shares in the Cooperative Corporation. Each shareholder in the Cooperative Corporation then would be granted the right to occupy a unit in the development through what is known as a proprietary lease.

11.   The defendants BRIAN R. CALLAHAN and ADAM J. MANSON agreed that after they bought the Panoramic View, they would each own a 50% interest in the development.

12.   In or around January 2007, the defendants BRIAN R. CALLAHAN and ADAM J. MANSON, through Distinctive Ventures, purchased all of the shares of the Cooperative Corporation for $38 million. In connection with the purchase, CALLAHAN and MANSON, through Distinctive Ventures, obtained a $35 million acquisition loan and a $10 million construction loan from a New York-based mortgage lending business, whose identity is known to the Grand Jury ("Lender One"). Distinctive Investments and Adam Manson were guarantors on the acquisition and construction loans.

13.   As part of the acquisition and construction loan agreements with Lender One, the defendant ADAM J. MANSON, through Distinctive Ventures executed certain promissory notes, in which

5

Distinctive Ventures agreed to make monthly payments to Lender One at a rate of interest of approximately 10%, and to apply the proceeds of sale of any cooperative unit towards the outstanding debt to Lender One.  The promissory notes matured in April 2008, which meant that MANSON and the defendant BRIAN R. CALLAHAN either needed to pay off the debt to Lender One by that date, obtain alternative financing to pay off Lender One, or get an extension of the loan from Lender One.  Lender One's loans were secured by, among other things, the unsold shares of the Cooperative Corporation and the proprietary leases associated with the Panoramic View's unoccupied units.

The Fraudulent Schemes

     A.  The Pangea Funds

     14.  The defendant BRIAN R. CALLAHAN used approximately $14 million of investor money from the Pangea Funds to pay part of the purchase price of the Cooperative Corporation.  CALLAHAN also used investor money in the Pangea Funds to make several monthly loan payments to Lender One in 2007, when the Panoramic View development was still under construction.

     15.  At various points in time, the defendant BRIAN R. CALLAHAN solicited investments in the Pangea Funds from new investors.  From in or around October 2006, and continuing through in or around February 2008, CALLAHAN solicited and received investments of approximately $600,000 in Pangea Offshore

from a fire department on Long Island, whose identity is known to the Grand Jury (the "Fire Department"). Callahan had represented to the Fire Department that he would invest its money in mutual funds and other securities.

16. Instead of investing the Fire Department's money in mutual funds and other securities, the defendant BRIAN R. CALLAHAN diverted the Fire Department's money to the Panoramic View. The Fire Department was unaware either that CALLAHAN was investing its money in the Panoramic View, or that CALLAHAN had a 50% ownership interest in the Panoramic View. To conceal his scheme, CALLAHAN sent fraudulent account statements to the Fire Department that falsely showed that the Fire Department's investment with Pangea Offshore was invested in approximately twelve different mutual funds. None of the account statements referenced any "investment" in the Panoramic View.

17. By early 2008, the defendant BRIAN R. CALLAHAN had depleted the Pangea Funds through, among other things, the payment of millions of dollars toward the purchase price of the Panoramic View, through redemptions of investor funds to old investors in the Pangea Funds, and through the use by CALLAHAN of more than $3 million dollars of investor money for his own personal benefit.

7

B. The Audited Callahan Funds

18.    The defendants BRIAN R. CALLAHAN and ADAM J.
MANSON were unsuccessful in selling cooperative shares in the
Panoramic View.  Although CALLAHAN and MANSON operated a portion
of the Panoramic View as a hotel, the proceeds from hotel
operations and from sales of cooperative shares at the Panoramic
View were insufficient to cover the loan payments to Lender One.
To cover the loan payments and other expenses associated with the
Panoramic View, in or around January 2008, CALLAHAN began to
redeem the investments of the Audited Callahan Funds, and
fraudulently divert those funds to the Panoramic View.  CALLAHAN
did not inform investors in the Audited Callahan Funds of this
diversion of funds.

19.    The defendants ADAM J. MANSON and BRIAN R.
CALLAHAN could not pay the outstanding balance of the loans with
Lender One by April 8, 2008, the original maturity date on the
acquisition and construction loans.  As a result, on or about
April 8, 2008, Lender One agreed to extend the maturity date of
the loans until on or about October 8, 2008.  In return for this
extension, MANSON agreed to pay an increased interest rate of
14%, and to pay a modification fee to Lender One in the amount of
approximately $822,000, including an initial payment of $350,000
that was due on or about April 8, 2008.

8

20. In April 2008, the defendant BRIAN R. CALLAHAN fraudulently used approximately $250,000 of investor funds from Diversified to pay for the modification fee. In fact, on or about April 7, 2008, CALLAHAN caused $250,000 to be sent by wire from an account for Diversified to an escrow account in the name of the defendant ADAM J. MANSON's father, a lawyer. At the time, the escrow account had a balance of approximately $269,000. The very next day, $350,000 was sent by wire from the escrow account to the loan administrator for Lender One in Atlanta, Georgia (the "Loan Administrator") to pay for the modification fee.

21. Because the Panoramic View was not generating enough income to pay its debts, and because the defendant BRIAN R. CALLAHAN had depleted the Pangea Funds and the majority of the Audited Callahan Funds' remaining investments, CALLAHAN was unable to satisfy redemption requests made by the investors in the Callahan investment funds. To satisfy these redemption demands, CALLAHAN began to operate the Audited Callahan Funds as a Ponzi scheme, whereby he commingled investor's deposits and money from new investors and used the money to pay redemptions to existing investors, instead of segregating the money by fund, investing the money for each of the respective funds and using the profits or existing funds to pay redemptions to the funds' respective investors. CALLAHAN also fraudulently used investors' money to pay: his personal expenses, including large credit card

bills and dues associated with his golfing club; down payments towards the purchase of luxury homes in Old Westbury and Westhampton, New York; and payments associated with luxury automobiles, including a Range Rover and a BMW.

i.    Callahan's Lies to Investors

22.    From April 2008 to January 2012, the defendant BRIAN R. CALLAHAN raised tens of millions of dollars by making, and causing to be made, materially false and fraudulent representations to the investors in the Audited Callahan Funds. For example, after April 2008, through emails and telephone calls, CALLAHAN continued to solicit new investors in Diversified, Horizon Millennium and Masters Global while representing that he would invest their money in Hedge Fund One, Hedge Fund Two and Hedge Fund Three, respectively. These representations were false, because after April 2008, CALLAHAN never made any such investments. Similarly, CALLAHAN falsely told investors in Fiduciary that their money would be invested in short-term liquid investments such as high dividend stocks and bonds, CDs and diverse government and corporate fixed income instruments. In fact, CALLAHAN never invested Fiduciary funds in stocks, bonds, CDs, fixed income instruments or any other securities. Instead, CALLAHAN used the new investment funds in Diversified, Horizon Millennium, Masters Global and Fiduciary: to satisfy redemption requests made by existing investors in the

10

Callahan investment funds; to pay the debts of the Panoramic View; and for his own personal benefit. Between December 2006 and February 2012, CALLAHAN raised approximately $118.7 million in the Audited Callahan Funds, and he misappropriated at least $96 million of those funds.

23. Between April 2008 and February 2012, the defendant BRIAN R. CALLAHAN also caused his investors to receive false account statements that inflated the value of their investments in the Callahan investment funds. To conceal his diversion of investor funds to the Panoramic View and to other investors in the Callahan investment funds, CALLAHAN caused account statements to reflect falsely the investment returns that the investors received on their investments. As a result, the sum of the investor balances stated on the account statements far exceeded the value of the assets actually held by the investors in the Callahan investment funds.

24. Between April 2008 and February 2012, the defendant BRIAN R. CALLAHAN also falsely represented to the investors in the Callahan investment funds that they could redeem their investments on demand and that investments in the Callahan investment funds were liquid. These statements were false and misleading because Callahan knew that the Callahan investment funds did not hold liquid investments and that the Callahan investment funds could not pay redemptions on demand. In fact,

by the end of 2011, the Callahan investment funds had, at most, less than 10% of the investors' principal investment available to pay any redemptions.

        ii.  <u>The Defendants Deceived the Independent Auditor</u>

      25.  The Independent Auditor served as the outside auditor of the Audited Callahan Funds from January 2007 to March 2012. The Independent Auditor was responsible for examining the financial statements of the Audited Callahan Funds and providing a written audit report that contained an opinion as to whether the financial statements were fairly stated. The Independent Auditor issued audit reports on the Audited Callahan Funds for 2007, 2008 and 2009, and was in the process of preparing audit reports for 2010 when it terminated its relationship with CALLAHAN and the Audited Callahan Funds in or around March 2012.

      26.  The Independent Auditor also prepared Schedule K-1 tax disclosures for the investors of the Audited Callahan Funds. The Schedule K-1 tax disclosures set forth the amount of tax that each investor was liable for based on their ownership share of the profits of the respective Audited Callahan Funds. When calculating the investors' profits for the tax disclosures, the Independent Auditor first calculated the value of the assets of each fund based on information that it received from the defendant BRIAN R. CALLAHAN. It then created a profit statement for each fund based on those asset calculations, which took into

account the increase in each asset's value during the relevant
period.   The Independent Auditor then allocated a portion of each
fund's profits to each particular investor based upon the
investor's ownership percentage of the particular fund.

27.   To further the fraudulent scheme described above,
the defendants BRIAN R. CALLAHAN and ADAM J. MANSON submitted
false documents to the Independent Auditor.   In so doing, they
deceived the Independent Auditor, and ultimately the investors of
the Audited Callahan Funds, into thinking that the Audited
Callahan Funds had substantial assets that were increasing in
value.   In fact, the Audited Callahan Funds did not have
substantial assets that were increasing in value.

28.   Specifically, during an approximate four year
period, beginning in or around January 2008, the defendants BRIAN
R. CALLAHAN and ADAM J. MANSON provided bogus promissory notes to
the Independent Auditor of the Audited Callahan Funds.   The
promissory notes purportedly were issued by Distinctive in
exchange for funds that CALLAHAN had diverted from Diversified
and Fiduciary to Distinctive.   CALLAHAN told the Independent
Auditor that these promissory notes represented debts owed to the
Audited Callahan Funds by Distinctive, and CALLAHAN and MANSON
submitted the bogus promissory notes to the Independent Auditor
in an effort to confirm to the Independent Auditor that the
promissory notes were assets of the Audited Callahan Funds.   The

13

Independent Auditor relied on the bogus promissory notes when it
issued audit reports for the Audited Callahan Funds.

29.  The amounts reflected in the bogus promissory
notes were fictitious.  For example, from in or around January
2009, and continuing through in or around June 2010, the
defendants BRIAN R. CALLAHAN and ADAM J. MANSON created
promissory notes and other documents which showed that as of
December 31, 2009, Distinctive owed Fiduciary a total of
approximately $10.1 million dollars.  CALLAHAN and MANSON then
submitted those promissory notes to the Independent Auditor.

30.  Those promissory notes issued to Fiduciary were
false.  In fact, as of December 31, 2009, Distinctive had only
ever received approximately $2.5 million from Fiduciary.
Moreover, those transfers were fraudulent in that they were
contrary to CALLAHAN's representations to Fiduciary investors.

31.  The Independent Auditor was unaware of those
facts, and the bogus promissory notes and other documents sent to
the Independent Auditor by the defendants BRIAN R. CALLAHAN and
ADAM J. MANSON caused the Independent Auditor to overvalue the
assets of Fiduciary by millions of dollars for 2009.

32.  Because the assets of Fiduciary were overvalued,
the Schedule K-1s issued to Fiduciary investors inflated
Fiduciary's asset valuations and profits.  Investors thus were
deceived into thinking that their investments in Fiduciary were

performing well. As a result, they continued to invest with CALLAHAN, and in some circumstances, they continued to make additional investments in the Callahan investment funds.

33. Although the defendants BRIAN R. CALLAHAN and ADAM J. MANSON knew of the existence of the promissory notes, CALLAHAN and MANSON never provided the promissory notes to the investors in the Audited Callahan Funds, and those investors remained unaware that their investments had been diverted to the Panoramic View.

34. The defendants BRIAN R. CALLAHAN and ADAM J. MANSON also deceived the Independent Auditor by falsely telling the Independent Auditor that the promissory notes Distinctive purportedly issued to the Audited Callahan Funds were the only debts related to the Panoramic View. CALLAHAN and MANSON fraudulently informed the Independent Auditor that, because the promissory notes were the only debt associated with the Panoramic View, the Audited Callahan Funds would receive payment on the promissory notes when Distinctive sold a cooperative unit to the public. As a result, the Independent Auditor valued the promissory notes submitted by CALLAHAN and MANSON as assets of the Audited Callahan Funds and valued the promissory notes at the value CALLAHAN and MANSON suggested. In fact, as both CALLAHAN and MANSON knew, Lender One held the shares associated with all unsold cooperative units at the Panoramic View as collateral on

its loan to Distinctive, and any sales proceeds of the cooperative units were paid to Lender One rather than the Audited Callahan Funds. CALLAHAN and MANSON concealed this fact from the Independent Auditor.

35. To conceal the fact that Lender One held the unsold units as collateral and was to be paid from the sales proceeds, the defendants BRIAN R. CALLAHAN and ADAM J. MANSON together created and submitted to the Independent Auditor false documents, including doctored closing statements associated with the sale of some cooperative units and a fake balance sheet. Those fraudulent documents hid the secured debt owed by Distinctive to Lender One. As a result, the Independent Auditor valued the promissory notes at face value, rather than demanding that CALLAHAN write down the value of the notes, because it was unaware that Lender One had a secured debt that was senior to any debt held by the Audited Callahan Funds, and that this secured debt owed to Lender One had to be paid off before any money could be sent to the Audited Callahan Funds for repayment. The Independent Auditor relied on the information CALLAHAN and MANSON supplied to it in preparing its audit reports of the Audited Callahan Funds.

iii. Callahan's Lies to the Independent Auditor

36. The defendant BRIAN R. CALLAHAN also deceived the Independent Auditor by creating sham promissory notes between the

16

Audited Callahan Funds and other entities, and submitting those
promissory notes to the Independent Auditor.  For example, in
February 2008, without the knowledge or consent of the investors
in the Audited Callahan Funds, Callahan used $475,000 of investor
money to buy a minority partnership interest in his own name in a
company that published archived church sermons on its website
(the "Archives Company").  On multiple occasions between 2008 and
2012, CALLAHAN falsely told the Independent Auditor that the
Archives Company had borrowed $475,000 from Diversified.  In
fact, the Archives Company had never borrowed any money from
CALLAHAN, Diversified or any of the Callahan investment funds.

        37.  When the Independent Auditor asked CALLAHAN for
the name of a third-party from the Archives Company who could
confirm the debt, CALLAHAN provided the Independent Auditor with
the name of a CALLAHAN investor ("John Doe 1"), an individual
whose identity is known to the Grand Jury.  Years earlier, John
Doe 1 had invested in a CALLAHAN investment fund called Pangea
Conservative, LLC ("Pangea Conservative") whose funds CALLAHAN
commingled with other money in the Pangea Funds' bank account.
In fact, John Doe 1, who owned a small construction business in
California, had no connection whatsoever to the Archives Company.
CALLAHAN also provided the Independent Auditor with fake contact
information for John Doe 1, including an email address and
telephone number that CALLAHAN had created himself.  CALLAHAN

17

used the fake email account to communicate with the Independent Auditor while pretending to be John Doe 1.   CALLAHAN also sent the Independent Auditor fake audit confirmations for the purported $475,000 loan from the Audited Callahan Funds to the Archives Company which bore John Doe 1's forged signature.

38.   Additionally, in or around February 2008, the defendant BRIAN R. CALLAHAN created and submitted to the Independent Auditor fake promissory notes and audit confirmations which falsely showed that Pangea Offshore owed Diversified $1.3 million.   The fake promissory notes and audit confirmations bore the forged signature of another investor in the old Pangea Conservative fund ("John Doe 2"), an individual whose identity is known to the Grand Jury.   John Doe 2, a podiatrist from California, was falsely identified on the audit confirmations as a "Managing Member" of Pangea Offshore when, in fact, John Doe 2 had no role in the management of the Pangea Funds or any other CALLAHAN investment fund.

39.   CALLAHAN fraudulently provided these sham promissory notes to the Independent Auditor as an asset of Diversified, and the Independent Auditor included the sham promissory notes as a Diversified asset in its 2008 audit report for Diversified, which it prepared in or around August 2009.

18

Manson's Fraud On Lender One

40. In or around July 2008, Lender One requested that
the defendant ADAM J. MANSON provide it with audited financial
statements concerning Distinctive Ventures, the borrower on
Lender One's acquisition and construction loans. Among other
things, Lender One wanted this information in order to determine
whether there were other creditors with a potential claim against
Distinctive Ventures and the Panoramic View in the event of a
default by Distinctive Ventures. Lender One wanted to know about
any other liabilities associated with Distinctive Ventures and
the Panoramic View, including promissory notes to third parties,
that would give a third party the status and rights of a creditor
during any legal proceedings stemming from a default,
particularly because Distinctive Ventures and MANSON were unable
to pay off the loans and were seeking another extension of the
maturity date of the loans.

41. Aware of Lender One's concern about the sources of
funding for Distinctive Ventures and the Panoramic View, the
defendant ADAM J. MANSON deceived Lender One by failing to
disclose to Lender One that the Callahan investment funds were
creditors of Distinctive Ventures and held promissory notes
issued by Distinctive purportedly valued at approximately $36
million.

19

42.   For example, the defendant ADAM J. MANSON lied to
Lender One by telling Lender One that equity investors in
MANSON's own investment fund had provided the funding for
Distinctive Ventures and the Panoramic View project.  MANSON also
told Lender One that there were no written agreements or
promissory notes requiring repayment to his equity investors,
thus causing Lender One to believe that the investors providing
the funds did not pose a risk as competing creditors of
Distinctive Ventures and the Panoramic View.  This information
was material and important to Lender One because, had it known of
other creditors of Distinctive Ventures and the Panoramic View,
it would have, at a minimum, investigated further the nature of
any risk posed by the Callahan investment funds to Lender One's
collateral.  Had it known of other creditors, Lender One also
would have considered not extending the maturity date of its
loans to Distinctive Ventures as a result of its increased loss
exposure.

43.   In furtherance of this scheme, during a telephone
call with Lender One on or about July 31, 2008, the defendant
ADAM J. MANSON falsely told Lender One that he had his own
investment fund that made equity contributions towards the
Panoramic View.  Manson told Lender One that there was no written
agreement between his investment fund and Distinctive Ventures
concerning repayment of these funds.  Instead, MANSON claimed

20

that his father had made an entry in the books and records of Distinctive Ventures, noting the equity contribution by MANSON's purported investment fund.

44. Later, during an in-person conference on or about September 2, 2008, Lender One and the defendant ADAM J. MANSON discussed a possible extension of Lender One's loans to Distinctive, which matured on October 8, 2008. During this conference, MANSON told Lender One that he could make a large equity contribution to the Panoramic View project. Lender One then pressed MANSON to disclose the source of his equity funds. In response, MANSON again falsely told Lender One that he had his own investment fund with between 35 and 40 individual equity investors, and that the partners in his equity fund had already made equity contributions to Distinctive and the Panoramic View in the amount of $22 million.

45. On or about September 23, 2008, during a telephone call with Lender One, the defendant ADAM J. MANSON falsely claimed that he had made a call to 32 investors in his investment fund, and that all but one of these investors had agreed to provide additional equity to Distinctive and the Panoramic View. Later, during a telephone conference on or about October 1, 2008, Lender One and MANSON again discussed extending the maturity date on the loans to Distinctive Ventures until on or about March 20, 2009. During that call, MANSON agreed to make an equity

contribution to the Panoramic View in the amount of $5 million. Of this money, $4 million would be applied to the payment of the principal balance of the loans, and $1 million would be placed into a debt service account. Lender One again insisted that MANSON identify the source of the funds he planned to use to make his $5 million equity contribution to the Panoramic View. This time, MANSON said that the source of the equity contributions were his friends and family. MANSON again assured Lender One that there was no written partnership agreement associated with his investment fund, and that there were no loan documents or written agreements requiring repayment to his investors.

46. During a subsequent telephone call with Lender One in or around early October 2008, the defendant ADAM J. MANSON told Lender One that, in fact, his only equity investor was his father. Thereafter, on or about October 6, 2008, MANSON sent an email to representatives of Lender One and a representative with the Atlanta, Georgia based Loan Administrator. MANSON copied his father on this email. In his email, MANSON falsely told Lender One that "[b]ased on the market conditions, deal conditions, and general global fears, at this time no investors are providing money except for - [my father] who is providing five million dollars - the total sum required for the extension . . . ." The following day, the Loan Administrator in Atlanta, Georgia received a wire in the amount of $5 million from an escrow

account in the name of MANSON's father.  Also on October 8, 2008, Lender One extended the maturity date of its loans to Distinctive Ventures until on or about March 20, 2009.

47.  As the defendant ADAM J. MANSON knew, his statement that his father was the source of the $5 million that Lender One received on or about October 8, 2008, was false.  In fact, the source of the $5 million was the Callahan investment funds.  On or about October 7, 2008, CALLAHAN wired $5 million from a bank account in the name of Diversified in the BVI to an escrow account in New York in the name of MANSON's father.  At the time of the wire, the escrow account had a balance of approximately $100.  The following day, on or about October 8, 2008, $5 million was wired from the escrow account in the name of MANSON's father to the Loan Administrator in Atlanta, Georgia. MANSON knew that the source of the funds was Callahan's investment funds.  Indeed, on or about October 7, 2008, MANSON signed a promissory note to Diversified from Distinctive Investments concerning the $5 million and, in 2009, provided the Independent Auditor with an audit confirmation of the $5 million debt owed by Distinctive Investments to Diversified.

<u>COUNT ONE</u>
(Conspiracy to Commit Securities Fraud)

48.  The allegations contained in paragraphs 1 through 47 are realleged and incorporated as though fully set forth in this paragraph.

23

49.    In or about and between June 2007 and March 2012, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants BRIAN R. CALLAHAN and ADAM J. MANSON, together with others, did knowingly and willfully conspire to use and employ manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the Securities and Exchange Commission (Title 17, Code of Federal Regulations, Section 240.10b-5), by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which would and did operate as a fraud and deceit upon members of the investing public, in connection with the purchases and sales of investments in the Audited Callahan Funds, directly and indirectly, by use of the means and instrumentalities of interstate commerce and the mails, contrary to Title 15, United States Code, Sections 78j(b) and 78ff.

50.    In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendants BRIAN R. CALLAHAN and ADAM J. MASON, together with others, committed and caused to be committed, among other things, the following:

OVERT ACTS

a.  On or about February 19, 2009, the defendant BRIAN R. CALLAHAN sent an email to Investor One, a retired school teacher in California whose identity is known to the Grand Jury, confirming receipt of wired funds from Investor One.

b.  On or about May 26, 2010, the defendant ADAM J. MANSON sent an email to the defendant BRIAN R. CALLAHAN concerning audit confirmations for Fiduciary.

c.  On or about October 15, 2010, the defendant ADAM J. MANSON sent an email to the Independent Auditor in the BVI concerning debt related to the Panoramic View.

d.  On or about November 23, 2010, the defendant BRIAN R. CALLAHAN sent an email to Investor Two, an individual whose identity is known to the Grand Jury, in Illinois concerning Fiduciary.

e.  On or about March 20, 2011, the defendant BRIAN R. CALLAHAN sent an email to Investor Three, an individual whose identity is known to the Grand Jury, in Illinois concerning Horizon Millennium and the Independent Auditor.

f.  On or about September 15, 2011, the defendant BRIAN R. CALLAHAN sent an email to Investor Four, an individual whose identity is known to the Grand Jury, in Wisconsin acknowledging receipt of wire of funds from Investor Four.

g.   On or about January 17, 2012, the defendant
ADAM J. MANSON sent an email containing a purported Distinctive
Ventures balance sheet to the defendant BRIAN R. CALLAHAN.

(Title 18, United States Code, Sections 371 and 3551 et
seq.)

## COUNT TWO
(Conspiracy to Commit Wire Fraud)

51.   The allegations contained in paragraphs 1 through
47 are realleged and incorporated as though fully set forth in
this paragraph.

52.   In or about and between April 2008 and January
2012, both dates being approximate and inclusive, within the
Eastern District of New York and elsewhere, the defendants BRIAN
R. CALLAHAN and ADAM J. MANSON, together with others, did
knowingly and intentionally conspire to devise a scheme and
artifice to defraud the investors in the Audited Callahan Funds,
and to obtain money and property from the investors in the
Audited Callahan Funds by means of materially false and
fraudulent pretenses, representations and promises and, for the
purpose of executing such scheme and artifice, to transmit and
cause to be transmitted by means of wire communication in
interstate and foreign commerce, writings, signs, signals,

26

pictures and sounds, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT THREE
### (Conspiracy to Commit Wire Fraud)

53. The allegations contained in paragraphs 1 through 47 are realleged and incorporated as though fully set forth in this paragraph.

54. In or about and between April 2008 and January 2012, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants BRIAN R. CALLAHAN and ADAM J. MANSON, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud the Independent Auditor, and to obtain money and property from the Independent Auditor by means of materially false and fraudulent pretenses, representations and promises and, for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

27

## COUNT FOUR
(Securities Fraud)

55. The allegations contained in paragraphs 1 through 47 are realleged and incorporated as though fully set forth in this paragraph.

56. In or about and between October 2006 and January 2009, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant BRIAN R. CALLAHAN, together with others, did knowingly and willfully use and employ one or more manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, in that CALLAHAN did knowingly and willfully (a) employ devices, schemes and artifices to defraud, (b) make untrue statements of material fact and omit to state material facts necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading, and (c) engage in acts, practices and courses of business which would and did operate as a fraud and deceit upon the Fire Department, in connection with the purchase and sale of investments in Pangea Offshore, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

28

## COUNT FIVE
(Securities Fraud)

57.   The allegations contained in paragraphs 1 through 47 are realleged and incorporated as though fully set forth in this paragraph.

58.   In or about and between April 2008 and January 2012, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants BRIAN R. CALLAHAN and ADAM J. MANSON, together with others, did knowingly and willfully use and employ one or more manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, in that CALLAHAN and MANSON did knowingly and willfully (a) employ devices, schemes and artifices to defraud, (b) make untrue statements of material fact and omit to state material facts necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading, and (c) engage in acts, practices and courses of business which would and did operate as a fraud and deceit upon members of the investing public, in connection with the purchases and sales of investments in the Audited Callahan Funds, directly

29

and indirectly, by use of means and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

## COUNTS SIX THROUGH FIFTEEN
### (Wire Fraud)

59.    The allegations contained in paragraphs 1 through 47 are realleged and incorporated as though fully set forth in this paragraph.

60.    In or about and between January 2008 and January 2012, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants BRIAN R. CALLAHAN and ADAM J. MANSON, together with others, did knowingly and intentionally devise a scheme and artifice to defraud the investors in the Audited Callahan Funds, and to obtain money and property from the investors in the Audited Callahan Funds by means of materially false and fraudulent pretenses, representations and promises.

61.    On or about the dates specified below, for the purpose of executing such scheme and artifice, the defendants BRIAN R. CALLAHAN and ADAM J. MANSON transmitted and caused to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds as described below:

30

| Count | Defendant | Approx. Date | Description |
|-------|-----------|--------------|-------------|
| SIX | BRIAN R. CALLAHAN | 11/08/2010 | Email sent from CALLAHAN in Old Westbury, New York to the Independent Auditor in the BVI concerning the Archives Company |
| SEVEN | BRIAN R. CALLAHAN | 12/17/2010 | E-mail sent from CALLAHAN in Old Westbury, New York to Investor Five, whose identity is known to the Grand Jury, in Maryland concerning Fiduciary and its purported investments in short-term fixed income instruments |
| EIGHT | BRIAN R. CALLAHAN | 2/03/2011 | Email sent from CALLAHAN in Old Westbury, New York to the Independent Auditor in the BVI concerning the Archives Company |
| NINE | BRIAN R. CALLAHAN | 2/15/2011 | E-mail sent from CALLAHAN in Old Westbury, New York to Investor Six, whose identity is known to the Grand Jury, in Illinois concerning Fiduciary and short-term fixed income instruments |
| TEN | BRIAN R. CALLAHAN | 2/23/2011 | Email sent from CALLAHAN in Old Westbury, New York to Investor Two in Illinois concerning Masters Global, Horizon Millennium and Diversified |
| ELEVEN | BRIAN R. CALLAHAN | 8/04/2011 | Email sent from CALLAHAN in Old Westbury, New York to Investor Two in Illinois concerning Masters Global |

| TWELVE | BRIAN R. CALLAHAN | 11/13/2011 | Email sent from CALLAHAN in Old Westbury, New York to Investor Seven, whose identity is known to the Grand Jury, in Kentucky concerning Diversified and Kinetics |
|---|---|---|---|
| THIRTEEN | BRIAN R. CALLAHAN and ADAM J. MANSON | 4/28/2009 | Email sent from MANSON in Great Neck, New York to the Independent Auditor in the BVI concerning audit confirmations for debt related to the Panoramic View |
| FOURTEEN | BRIAN R. CALLAHAN and ADAM J. MANSON | 12/21/2011 | E-mail sent from CALLAHAN in Old Westbury, New York to the Independent Auditor in the BVI concerning closing statements associated with the Panoramic View |
| FIFTEEN | BRIAN R. CALLAHAN and ADAM J. MANSON | 1/17/2012 | E-mail sent from CALLAHAN in Old Westbury, New York to the Independent Auditor in the BVI concerning a Distinctive balance sheet |

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

## COUNTS SIXTEEN THROUGH SEVENTEEN
(Wire Fraud)

62.   The allegations contained in paragraphs 1 through 47 are realleged and incorporated as though fully set forth in this paragraph.

63.   In or about and between January 2008 and January 2012, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants BRIAN

32

R. CALLAHAN and ADAM J. MANSON, together with others, did knowingly and intentionally devise a scheme and artifice to defraud the Independent Auditor, and to obtain property from the Independent Auditor by means of materially false and fraudulent pretenses, representations and promises.

64. On or about the dates specified below, for the purpose of executing such scheme and artifice, the defendants BRIAN R. CALLAHAN and ADAM J. MANSON transmitted and caused to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds as described below:

| Count | Defendant | Approx. Date | Description |
|-------|-----------|--------------|-------------|
| SIXTEEN | BRIAN R. CALLAHAN and ADAM J. MANSON | 10/15/2010 | Email sent from MANSON in Great Neck, New York to the Independent Auditor in the BVI concerning debt related to the Panoramic View |
| SEVENTEEN | BRIAN R. CALLAHAN and ADAM J. MANSON | 8/25/2011 | Email sent from MANSON in Great Neck, New York to the Independent Auditor in the BVI concerning audit confirmations for debt related to the Panoramic View |

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

33

## COUNTS EIGHTEEN THROUGH TWENTY-TWO
### (Wire Fraud)

65.  The allegations contained in paragraphs 1 through 47 are realleged and incorporated as though fully set forth in this paragraph.

66.  In or about and between October 2007 and May 2011, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant ADAM J. MANSON, together with others, did knowingly and intentionally devise a scheme and artifice to defraud Lender One, and to obtain money and property from Lender One by means of materially false and fraudulent pretenses, representations and promises.

67.  On or about the dates specified below, for the purpose of executing such scheme and artifice, the defendant ADAM J. MANSON transmitted and caused to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds as described below:

| Count | Defendant | Approx. Date | Description |
|-------|-----------|--------------|-------------|
| EIGHTEEN | ADAM J. MANSON | 10/06/2008 | Email sent from MANSON in Great Neck, New York to Lender One and the Loan Administrator through email servers in New Jersey and Georgia, respectively, concerning payment of $5 million |

34

| NINETEEN | ADAM J. MANSON | 10/07/2008 | Email sent from MANSON in Great Neck, New York to Lender One and the Loan Administrator through email servers in New Jersey and Georgia, respectively, concerning payment of $5 million |
| TWENTY | ADAM J. MANSON | 10/07/2008 | Wire of funds from bank in BVI to an escrow account in New York in the name of MANSON's father |
| TWENTY-ONE | ADAM J. MANSON | 10/08/2008 | Email sent from MANSON in Great Neck, New York to Lender One through email server in New Jersey, concerning settlement statement |
| TWENTY-TWO | ADAM J. MANSON | 10/08/2008 | Wire of funds from escrow account in New York in the name of MANSON's father to a bank account in the name of the Loan Administrator in Georgia |

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

## COUNT TWENTY-THREE
(Aggravated Identity Theft)

68.   The allegations contained in paragraphs 1 through 47 are realleged and incorporated as though fully set forth in this paragraph.

69.   On or about and between May 1, 2010 and March 1, 2013, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant BRIAN R. CALLAHAN, during and in relation to the crimes charged in

Counts Five and Six, did knowingly and intentionally possess and use, without lawful authority, means of identification of another person, to wit: John Doe 1, knowing that the means of identification belonged to another person.

(Title 18, United States Code, Sections 1028A(a)(1), 1028A(b), 1028A(c)(7) and 3551 et seq.)

## COUNT TWENTY-FOUR
### (Aggravated Identity Theft)

70. The allegations contained in paragraphs 1 through 47 are realleged and incorporated as though fully set forth in this paragraph.

71. On or about and between February 1, 2008 and September 1, 2009, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant BRIAN R. CALLAHAN, during and in relation to the crimes charged in Counts Five and Six, did knowingly and intentionally possess and use, without lawful authority, means of identification of another person, to wit: John Doe 2, knowing that the means of identification belonged to another person.

(Title 18, United States Code, Sections 1028A(a)(1), 1028A(b), 1028A(c)(7) and 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION
### AS TO COUNTS ONE THROUGH TWENTY-TWO

72. The United States hereby gives notice to the defendants charged in Counts One through Twenty-Two that, upon

36

their conviction of any of such offenses, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property constituting or derived from proceeds obtained directly or indirectly as a result of such offenses including, but not limited to, the following:

     a.  the real property, together with its respective buildings, appurtenances, improvements, fixtures, attachments, easements and furnishings, located at 272 Old Montauk Highway, Montauk, New York 11954, and all proceeds traceable thereto;

     b.  any and all shares of 93 Old Montauk Owners, Inc., a New York cooperative corporation, held in the name of Distinctive Ventures, LLC, and all proceeds traceable thereto;

     c.  any and all shares of 93 Old Montauk Owners, Inc., held in the name of Brian Callahan and his wife, together with the proprietary lease for Cooperative Unit Salt Sea #4 at the real property located at 272 Old Montauk Highway, Montauk, New York 11954, and all proceeds traceable thereto;

     d.  the real property, together with its respective buildings, appurtenances, improvements, fixtures, attachments, easements and furnishings, located at 47 Clock Tower

Lane, Old Westbury, New York 11568, and all proceeds traceable
thereto; and

           e.    the real property, together with its
respective buildings, appurtenances, improvements, fixtures,
attachments, easements and furnishings, located at 538 Dune Road,
Unit #10, Westhampton Beach, New York 11978, and all proceeds
traceable thereto.

        73.  If any of the above-described forfeitable
property, as a result of any act or omission of the defendants
charged in Counts One through Twenty-Two:

           a.    cannot be located upon the exercise of due
diligence;

           b.    has been transferred or sold to, or deposited
with, a third party;

           c.    has been placed beyond the jurisdiction of
the court;

           d.    has been substantially diminished in value;
or

           e.    has been commingled with other property which
cannot be divided without difficulty;
it is the intent of the United States, pursuant to Title 21,
United States Code, Section 853(p), as incorporated by Title 28,
United States Code, Section 2461(c), to seek forfeiture of any

38

other property of such defendants up to the value of the
forfeitable property described in this forfeiture allegation.

(Title 28, United States Code, Section 2461(c); Title
18, United States Code, Section 981(a)(1)(C); Title 21, United
States Code, Section 853(p))

A TRUE BILL

_____
FOREPERSON

_____
LORETTA E. LYNCH
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

39

FORM DBD-34
JUN. 85

*No. 2012R00953*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF NEW YORK

## CRIMINAL DIVISION

## THE UNITED STATES OF AMERICA

*vs.*

### BRIAN R. CALLAHAN and
### ADAM J. MANSON

Defendants.

# INDICTMENT

T. 15, U.S.C., §§ 78j (b) and 78ff; T. 18, U.S.C. §§ 371, 981(a) (1) (C),
1028A (a) (1), 1028A (b), 1028A (c) (7), 1343, 1349, 2 and 3551 et seq.;
T. 21, U.S.C., § 853 (p); T. 28, U.S.C., § 2461 (c))

*A true bill.*

_____
*Foreman*

*Filed in open court this* _____ *day,*

*of* _____ *A.D. 20* _____

_____
*Clerk*

*Bail, $* _____

_____

CHRISTOPHER C. CAFFARONE, (631) 715-7868